**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| Ravichandra Tumu, | |
| *Plaintiff,* | Case No. 5:26-cv-03834 |
| v. | |
| ROYCOIN; Stephanie Doe; Owen Doe; the Binance Off-Ramp Defendant; Eric Lim; and Chapel Construction Inc, | **Complaint** |
| *Defendants.* | |

Plaintiff Ravichandra Tumu hereby sues ROYCOIN, Stephanie Doe, Owen Doe, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc (collectively, the "Defendants"). In support, he alleges as follows.

### I.    Preliminary Statement

1.    Our country is in the midst of a crypto-fraud crisis. Foreign criminal organizations have stolen billions of dollars from hardworking Americans in what are known as "pig-butchering scams", and are continuing to do so even as we speak. These schemes are not isolated incidents or amateur swindles. They are industrialized, transnational fraud operations that rely on scripted psychological manipulation, sophisticated online

- 1 -

infrastructure, and extensive money-laundering networks to extract enormous sums from victims while evading detection and recovery.

2. Although the particulars vary from case to case, the structure of these schemes is strikingly consistent. Scammers initiate contact with victims, usually through social media, messaging applications, or dating platforms, and cultivate trust over weeks or months using carefully designed social-engineering techniques. Once trust is established, victims are induced to "invest" through realistic-looking online cryptocurrency platforms that falsely display fabricated profits. As victims are encouraged to deposit ever-larger amounts of money, the illusion of legitimate investment success deepens. When victims attempt to withdraw their funds, they are met with manufactured obstacles, purported taxes, fees, or compliance requirements, designed to extract still more money. Ultimately, when victims can no longer pay or begin to question the scheme, the perpetrators abruptly sever communications and abscond with the victims' assets.

3. Tens of thousands of Americans have lost their life savings to pig-butchering scams. Recent academic research and law-enforcement reporting indicate that pig-butchering organizations have stolen more than **$75 billion** worldwide since 2020. According to the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3), American victims reported approximately $9.3 billion in losses from cryptocurrency investment fraud in 2024, a figure that reflects only reported complaints and is widely

believed to understate actual harm. Globally, blockchain analytics firm Chainalysis estimates that crypto-related scams and fraud extracted between $14 billion and $17 billion from victims in 2025, the highest annual figure on record and a continuing upward trend driven by increasingly sophisticated social-engineering and AI-enabled tactics. These figures underscore the scale, organization, and escalating financial impact of pig-butchering and related schemes on U.S. consumers.

4.      This action arises from an archetypical pig-butchering scam. The Defendants tricked Mr. Tumu into investing on a platform that turned out to be a scam, and in so doing stole **$621,048** of the victim's savings. Mr. Tumu has now been "slaughtered," in the scammers' parlance, and the stolen money spirited away to foreign bank accounts and crypto wallets.

5.      This action and coordination with law enforcement are the victim's only hopes for recovery. This suit seeks the return of the assets stolen by the Defendants and additional relief described below.

## II.    Parties

6.      Plaintiff Ravichandra Tumu is an individual residing in Texas. Plaintiff brings this action to recover assets stolen through the fraudulent scheme described herein.

7.      ROYCOIN is a fraudulent cryptocurrency-investment platform operating as a general partnership. Its headquarters and situs of organization lie outside the United States, although the precise locations from which it carries out its operations are presently unknown.

8. Stephanie Doe is an individual of foreign citizenship whose present whereabouts are unknown.

9. The Binance Off-Ramp Defendant is a recipient of the assets misappropriated from the victim in this case. The Binance Off-Ramp Defendant is a foreign individual or entity whose present whereabouts and citizenship are unknown.

10. Owen Doe is an individual who acted as a trading coach and investment advisor within the fraudulent scheme. Doe is of foreign citizenship, and Doe's present whereabouts are unknown.

11. Eric Lim is an individual or entity that, after the primary fraud was discovered, contacted Mr. Tumu and posed as a recovery service capable of retrieving the stolen assets. Eric Lim is of foreign citizenship, and its present whereabouts are unknown.

12. Chapel Construction Inc is an individual or entity that maintained a bank account into which Mr. Tumu was directed to wire funds as part of the fraudulent scheme. The precise identity, citizenship, and present whereabouts of Chapel Construction Inc are unknown.

### III.   Jurisdiction & Venue

13. This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Accordingly, this Court has federal-question jurisdiction.

14. This Court has personal jurisdiction over Defendants pursuant to RICO and consistent with the Due Process Clause of the Fifth Amendment.

RICO authorizes nationwide service of process, and where, as here, a federal statute provides for such service, the relevant constitutional inquiry is whether Defendants have sufficient aggregate contacts with the United States as a whole, not with any single state.

15. The Defendants purposefully directed their conduct at the United States by targeting U.S. residents, inducing the transfer of funds from U.S.-based accounts, utilizing U.S.-based cryptocurrency infrastructure and internet services, and causing substantial harm within the United States. Exercising personal jurisdiction over Defendants therefore comports with traditional notions of fair play and substantial justice, and is reasonable under the Supreme Court's flexible due-process framework applicable to federal statutes providing for nationwide service of process.

16. In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). This action arises under federal law, Defendants are not subject to the personal jurisdiction of any single state's courts, and Defendants have sufficient contacts with the United States as a whole to satisfy due process. Accordingly, the exercise of jurisdiction under Rule 4(k)(2) is proper.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3), which provides that a foreign defendant may be sued in any judicial district.

## IV.     Background

18.     Pig-butchering scams are a recognized and extensively documented form of organized investment fraud. This section describes the defining characteristics of these schemes, including their origin, structure, and reliance on cryptocurrency and online infrastructure, as established by law-enforcement agencies, regulators, and academic research.

### A.     Definition & Origin of Pig-Butchering Scams

19.     The fraud scheme commonly referred to as "pig butchering" is a well-recognized form of cyber-enabled investment fraud that combines elements of social-engineering, relationship-based manipulation, and fictitious investment platforms. The term derives from the Chinese phrase Shā Zhū Pán (杀猪盘), which translates literally to "killing the pig," and is used to describe a process by which victims are deliberately cultivated over time before being financially exploited.

20.     Pig-butchering scams are characterized not by a single deceptive act, but by a structured, multi-stage process. Perpetrators initiate contact with victims through online channels such as social-media platforms, messaging applications, or dating services, often under false identities. Over time, the perpetrators build rapport and trust with victims through sustained communication, shared narratives, and carefully scripted interactions. Only after this trust has been established do perpetrators introduce purported investment opportunities, most frequently involving cryptocurrency.

21.     Law-enforcement agencies and regulators in the United States have formally recognized pig-butchering schemes as a distinct and prevalent fraud typology. The Federal Bureau of Investigation ("FBI"), through its Internet Crime Complaint Center ("IC3"), has repeatedly warned that cryptocurrency investment fraud, of which pig-butchering is a major component, has become the leading source of reported financial losses among all categories of cybercrime. Similarly, the Financial Crimes Enforcement Network ("FinCEN") has issued alerts identifying pig-butchering as a widespread and organized form of virtual-currency investment fraud.

22.     Academic researchers have likewise studied pig-butchering scams as a discrete and repeatable fraud model. Scholarly literature describes these schemes as "hybrid" investment frauds that merge techniques commonly associated with romance scams, confidence fraud, and financial deception into a single operational framework. This research emphasizes that pig-butchering scams are not opportunistic or ad hoc, but instead follow standardized methods that are reused across victims, platforms, and jurisdictions.

23.     As described in these law-enforcement and academic sources, pig-butchering scams are best understood as a system of fraud rather than a series of isolated incidents. The defining feature of the scheme is the intentional "fattening" of victims, psychologically and financially, through prolonged engagement, escalating investment prompts, and the illusion of

legitimate profit, followed by the rapid misappropriation of the victims' funds once withdrawal is attempted or skepticism arises.

### B.    Organizational and Industrial Nature of Pig-Butchering Operations

24.    Pig-butchering scams are not carried out by individual opportunists acting alone. Instead, they are operated by organized groups that employ standardized processes, division of labor, and centralized coordination to target large numbers of victims simultaneously. Law-enforcement investigations and academic research consistently describe these schemes as enterprise-level operations capable of sustaining fraud across jurisdictions and over extended periods of time.

25.    These operations typically involve distinct functional roles. Some participants are responsible for initiating contact with victims and maintaining ongoing communications using scripted social-engineering techniques. Others manage the technical infrastructure used to create and operate fraudulent investment platforms, including websites and mobile applications that falsely display account balances and purported profits. Additional participants oversee the receipt, movement, and aggregation of victim funds, often through cryptocurrency wallets and exchange accounts. This specialization allows the enterprise to scale efficiently while insulating the scams' bosses, software developers, and money-laundering specialists from direct contact with victims.

26.    Pig-butchering organizations rely heavily on pre-written scripts, training materials, and operational playbooks. Academic studies and investigative reporting have documented the use of standardized messaging templates tailored to different victim profiles, including variations based on age, gender, geographic location, and perceived financial capacity. These scripts are designed to cultivate emotional trust, reinforce perceived legitimacy, and gradually escalate financial commitments over time.

27.    The organizational structure of pig-butchering schemes also enables continuity. When a particular wallet address, online persona, or fraudulent platform is exposed, operators are able to rapidly substitute new infrastructure while maintaining the same underlying methods and personnel. This adaptability allows the enterprise to persist even as individual components are identified or disrupted, and contributes to the repeatable and ongoing nature of the fraud.

28.    Law-enforcement and regulatory authorities have further reported that many pig-butchering operations are transnational in scope, with participants, infrastructure, and financial flows spanning multiple countries. These schemes frequently exploit global internet services, cross-border financial systems, and cryptocurrency networks to reach victims in the United States while operating largely outside the victims' physical jurisdictions.

## C.   Reliance on Cryptocurrency and Online Infrastructure

29.   Pig-butchering scams rely heavily on cryptocurrency and internet-based infrastructure to facilitate both the execution and concealment of fraudulent activity. Cryptocurrency enables perpetrators to receive and move large sums of value rapidly, across borders, and with a degree of pseudonymity that is difficult for individual victims to penetrate without legal process. As a result, cryptocurrency has become a central tool in the operation and scaling of pig-butchering schemes.

30.   In a typical pig-butchering operation, victims are directed to transfer funds to specific cryptocurrency wallets or accounts designated by the perpetrators. These wallets are often presented to victims as part of legitimate trading platforms or investment accounts, even though the platforms themselves are fictitious or controlled entirely by the fraud enterprise. The appearance of legitimate account balances and trading activity is generated through manipulated platform interfaces rather than actual market participation.

31.   To manage volume and liquidity, pig-butchering operations commonly route victim funds through centralized cryptocurrency exchanges, custodial services, or other third-party infrastructure providers. These intermediaries play a functional role in the fraud ecosystem by enabling the aggregation, storage, conversion, and onward transfer of misappropriated

assets. The use of such services allows perpetrators to consolidate funds from multiple victims and to move assets through successive layers of accounts.

32. The design of these schemes prioritizes speed and dissipation. Once funds are transferred by victims, perpetrators often move the assets quickly through multiple wallets or accounts in an effort to frustrate tracing and recovery. This rapid movement increases the risk that stolen assets will be irretrievably lost unless prompt investigative and legal measures are taken.

33. Because pig-butchering scams depend on identifiable cryptocurrency transactions and the use of centralized infrastructure at key stages, blockchain analysis and legal process directed to service providers are critical tools for identifying the flow of stolen assets and preserving them for potential recovery. Courts are therefore routinely called upon to evaluate requests for asset preservation and expedited discovery in cases involving this form of fraud.

## V. Application of Pig-Butchering Framework to Victim's Experience

34. The events giving rise to this action reflect the same sequence of conduct, methods, and structural features that characterize pig-butchering schemes as described above. The following factual allegations illustrate how those features manifested in the victim's experience.

## A.    Initial Contact & Grooming of Victim

35.    On January 5, 2025, Mr. Tumu was initially contacted by an individual via direct message on X/Twitter who presented himself as an expert in stock options and cryptocurrency investing. This individual advertised novel trading strategies and investment opportunities, generating Mr. Tumu's interest with claims of substantial profits. Skeptical but intrigued, Mr. Tumu requested further information regarding these investment methods and was encouraged to engage with an account manager named Owen. Pursuant to Owen's direction, Mr. Tumu was added to a trading group, where purported professional traders discussed market opportunities and shared investment tips to foster a sense of legitimacy and collaboration.

36.    Shortly thereafter, Mr. Tumu was introduced to Stephanie Doe, who contacted him via WhatsApp in a professional capacity. Stephanie, acting as the assistant to the initial promoter, contributed trading signals to Mr. Tumu and played a supportive role in contextualizing the investments discussed within the trading group. The progression from the initial X/Twitter contact, through communication with Owen, and introduction to Stephanie on WhatsApp was designed to reinforce trust and establish an aura of professional trading expertise.

## B.    Introduction of the 'Investment Platform'

37.    Following this period of grooming and rapport-building within the trading group, account manager Owen directed Mr. Tumu to a

cryptocurrency trading platform named ROYCOIN. Both Owen and Stephanie provided detailed instructions for setting up an account on ROYCOIN, highlighting the platform's purported advanced trading tools and unique opportunities for profit. Mr. Tumu was encouraged to make small initial investments, which were quickly followed by fabricated trading returns displayed on the platform interface. He was allowed to execute a minor withdrawal of approximately $100, an action staged to prove ROYCOIN's legitimacy and reliability. Persuaded by these initial successes and by Stephanie's continued assurances, Mr. Tumu proceeded to transfer approximately $15,000 over the subsequent weeks to his ROYCOIN account to begin more substantial trading activities.

### C.    Escalation of Deposits & Directed Transfers

38.    Encouraged by what appeared to be consistently positive trading returns and under the continued advisement of both Owen and Stephanie, Mr. Tumu escalated his investments substantially. Stephanie provided regular trading signals and highlighted opportunities to capitalize on market movements, justifying additional deposits as necessary steps to seize exceptional profits. In February 2025, representatives of ROYCOIN extended an offer of a $250,000 trading loan to Mr. Tumu on the condition that his investment activity would yield sufficient profits to facilitate loan repayment out of accrued gains. This offer was endorsed by Stephanie, who assured Mr. Tumu of the safety and necessity of this course of action to maximize his returns. Enticed by promises of amplified profit and spurred by escalating

communications from both the trading coach and platform representatives, Mr. Tumu proceeded to commit increasingly significant sums to ROYCOIN, with his cumulative deposits eventually totaling $333,637 and subsequent fee and tax payments raising his total outlay to **$621,048**. These investments were sourced from Mr. Tumu's personal funds as well as other lawful sources available to him.

### D.    Attempted Withdrawal & Loss of Funds

39.    By May 10, 2025, Mr. Tumu sought to regularize his position by applying his purported trading profits to repay the $250,000 loan advanced by ROYCOIN. However, the platform notified Mr. Tumu that only full repayment from his personal funds, rather than deductions from his virtual trading balance, would be permitted before any withdrawals could be processed. Despite making a series of installment payments to satisfy the margin call and repeatedly paying alleged taxes and associated fees at the platform's insistence, Mr. Tumu remained unable to access his account balance. The repeated imposition of fee demands, the refusal to honor withdrawal requests, and mounting evidence of bad faith led Mr. Tumu to conclude that he had been the victim of a sophisticated fraud.

### E.    Representative Misrepresentations Made to Mr. Tumu

40.    The perpetrators made numerous false representations to induce Mr. Tumu's participation and ongoing investment. First, regarding identity and credentials, the original promoter, Owen as account manager,

and Stephanie as trading assistant, all claimed expertise in professional financial trading and investment management, presenting themselves as capable of structuring lucrative investment opportunities. Second, as to the legitimacy of the platform, ROYCOIN was described as a bona fide cryptocurrency trading environment with advanced investor protections, where trading activities were governed transparently and securely. Third, repeated representations were made regarding expected returns, with both the trading group and platform personnel assuring Mr. Tumu of outsized profits, the safety of funds, and the reliability of trading signals. Lastly, critical misrepresentations were made regarding withdrawal conditions: it was repeatedly asserted that any and all funds, principal, returns, and loan proceeds, were withdrawable at any time following satisfaction of all outstanding obligations and fees, none of which proved to be true as the platform ultimately denied all withdrawal requests irrespective of compliance.

### F. Secondary Victimization — The Recovery Scam

41. After realizing his assets could not be recovered through ROYCOIN, Mr. Tumu was approached in early June 2025 by an individual named Eric Lim, who identified himself as an attorney affiliated with Gordon Rome Law Firm, a firm purporting to specialize in digital-asset recovery. Lim represented to Mr. Tumu that he could track and recover the digital assets lost in the ROYCOIN scam using specialized legal and forensic channels. Over an extended series of communications, Lim and his associates solicited

multiple payments from Mr. Tumu on the pretext of covering legal fees, asset tracing costs, and administrative taxes, with total payments exceeding $250,000. These fees were demanded as necessary prerequisites for asset recovery, and assurances were regularly given that return of the funds was imminent pending completion of these transactions. However, once the payments were rendered in accordance with their demands, Lim and personnel at Gordon Rome Law Firm terminated all communication with Mr. Tumu and failed to remit any recovered assets, compounding Mr. Tumu's losses and resulting in a second episode of fraudulent victimization.

## VI.    Tracing & Movement of Misappropriated Assets

42.    This section describes the movement of Mr. Tumu's misappropriated cryptocurrency assets from the initial transfers induced by the fraud through subsequent transactions on the blockchain, including transfers through wallets and centralized cryptocurrency services associated with the Defendants.

### A.    Transfers of Cryptocurrency from Mr. Tumu

43.    In reliance on the misrepresentations described above, Mr. Tumu transferred cryptocurrency to wallet addresses designated by the perpetrators and presented as associated with the purported investment platform. These transfers were made over a defined period and consisted of multiple transactions of increasing value.

44.    Each transfer was initiated by Mr. Tumu from cryptocurrency wallets under Mr. Tumu's control and was directed to specific destination

wallet addresses provided by the perpetrators. The Victim understood these transfers to constitute deposits into a legitimate investment account. In reality, the transfers resulted in the permanent relinquishment of control over the cryptocurrency to the fraud enterprise.

### B.     Blockchain Tracing of the Stolen Assets

45.     Blockchain analysis performed after discovery of the fraud identified the movement of Mr. Tumu's cryptocurrency from the initial destination wallets through a series of subsequent transactions. Because cryptocurrency transactions are recorded on public blockchains, the flow of funds could be traced despite the perpetrators' use of pseudonymous wallet addresses.

46.     The tracing analysis demonstrated that the destination wallets provided to Mr. Tumu were not independent investment accounts but were instead aggregation wallets used to receive funds from multiple victims. From these wallets, the cryptocurrency was rapidly transferred to additional wallets in patterns consistent with laundering and concealment.

47.     The movement of funds followed a repeatable structure commonly observed in pig-butchering schemes. Specifically, blockchain tracing revealed the following.

48.     Subsequent blockchain analysis revealed that the digital assets transferred by Mr. Tumu as part of his purported ROYCOIN investments, as well as his payments of fees and taxes, moved through a series of blockchain addresses associated with third-party exchanges and payee entities.

Specifically, substantial assets were funneled through several cryptocurrency addresses identified as serviced by unknown exchanges, while other funds were traced to addresses and wallets under the control of Huione Group and Binance. In total, transfers from Mr. Tumu corresponding to losses of approximately **$621,048** were tracked flowing from his accounts into and through these intermediary wallets and exchanges. No evidence was found of the assets being returned to Mr. Tumu, and the patterns of asset movement comported with other known pig-butchering fraud typologies connected to the named defendants.

### C.    Transfers through Centralized Exchanges & Custodial Services

49.    Tracing analysis further revealed that a substantial portion of Mr. Tumu's cryptocurrency was transferred from intermediary wallets to accounts held at centralized cryptocurrency exchanges and custodial service providers. These services enable the storage, conversion, and withdrawal of cryptocurrency and serve as critical exit points for fraud proceeds.

50.    The transfers into these services were identifiable through on-chain transaction data and corresponded to known deposit addresses associated with specific platforms. Once deposited, the assets were commingled with other funds and became subject to the internal account controls of the custodial providers.

51.    The use of centralized exchanges and custodial services allowed the Defendants to convert, transfer, or withdraw stolen assets in a manner

that would be difficult or impossible for individual victims to prevent without timely judicial intervention.

### D.   Dissipation Risk and Need for Prompt Asset Preservation

52.   The tracing analysis showed that the stolen assets were moved rapidly after receipt and continued to be transferred through multiple wallets and platforms. This pattern reflects a deliberate effort by the Defendants to dissipate and conceal the proceeds of fraud and substantially increases the risk that the assets will be irretrievably lost.

53.   Because cryptocurrency transactions are irreversible and because custodial platforms may permit rapid withdrawal or conversion absent legal restraint, delays in investigation or court-ordered relief materially reduce the likelihood of recovery.

54.   Courts addressing pig-butchering and similar cryptocurrency fraud schemes have recognized that early asset tracing, preservation orders, and expedited discovery are essential to prevent irreparable harm to victims and to preserve the possibility of restitution.

55.   In addition to cryptocurrency transfers, Mr. Tumu was directed by the perpetrators to send funds via wire transfer directly to bank accounts designated by the scheme's participants. These wire transfers were made in reliance on the same misrepresentations described above.

56.   As part of both the primary fraud and the subsequent attempt to recover funds, Mr. Tumu was directed on multiple occasions to transmit

substantial sums via wire transfer. Certain of these payments, including fees and repayments purportedly directed at satisfying ROYCOIN's loan and margin requirements, were transmitted to accounts including those held by Chapel Construction Inc. Additional wire instructions were furnished by both the ROYCOIN representatives and the recovery scammer's purported law firm, specifying recipient details and remittance amounts. The aggregate funds transmitted via wire as part of these frauds contributed to the total traced loss of **$621,048** . Where available, bank account information corresponded to the named wire recipient, but no lawfully recoverable consideration or services were ever rendered to Mr. Tumu in return for these substantial wire payments.

### E.    Connection Between Traced Assets and Defendants

57.    The wallets, accounts, and infrastructure through which Mr. Tumu's assets were transferred are associated with the Defendants and/or entities that provided services integral to the operation of the fraud scheme. These services enabled the receipt, aggregation, storage, and movement of stolen assets and were necessary to the scheme's success.

58.    The tracing evidence establishes a direct causal link between the Defendants' fraudulent conduct, Mr. Tumu's financial transfers, and the subsequent movement of those assets through identifiable wallets and service providers. This chain of transactions confirms that Mr. Tumu's losses were the foreseeable and intended result of the scheme.

## VII.  Defendants' Roles & Participation in the Fraudulent Scheme

59.    The fraudulent scheme described above depended on the coordinated participation of multiple Defendants, each of whom performed a distinct and essential role. As alleged herein, each Defendant knowingly engaged in conduct that furthered the scheme and was necessary to its success.

### A.    Stephanie Doe — The Groomer and Social-Engineering Operator

60.    Stephanie Doe acted as the primary groomer and social-engineering operator in the scheme. Doe initiated contact with Mr. Tumu, maintained ongoing communications over messaging applications, and made the misrepresentations that induced Mr. Tumu to transfer cryptocurrency.

61.    Using a fabricated identity and false personal background, Doe cultivated trust through sustained interaction, personal disclosures, and representations of financial sophistication. Doe controlled the pacing of the scheme, including when investment discussions were introduced and when additional transfers were solicited.

62.    Doe directed Mr. Tumu to use the purported trading platform operated by ROYCOIN and provided instructions regarding how and where cryptocurrency should be transferred. Doe further conveyed false assurances regarding profits, account balances, and Mr. Tumu's ability to withdraw funds.

63.     This conduct is consistent with the role of groomers in pig-butchering schemes as documented in academic literature and law-enforcement reporting, which describe groomers as frontline operators responsible for inducing victim transfers while remaining insulated from the receipt and laundering of funds.

### B.     ROYCOIN — Operator of the Fraudulent Trading Platform

64.     ROYCOIN operated, controlled, or materially supported the purported cryptocurrency trading platform used in the scheme. This platform was presented to Mr. Tumu as a legitimate investment service but was, in reality, a fictitious or controlled environment designed to simulate trading activity and display fabricated profits.

65.     The platform operated by ROYCOIN served as the central mechanism by which the scheme created the illusion of legitimacy. Its interfaces, dashboards, account balances, and transaction histories were designed to induce reliance, encourage additional deposits, and delay detection of the fraud.

66.     ROYCOIN did not engage in genuine market trading on behalf of Mr. Tumu. Instead, the platform's reported activity was illusory and functioned to reinforce the misrepresentations made by Stephanie Doe, including false claims regarding profitability and withdrawability.

67.     The use of a controlled or fictitious trading platform in this manner is a defining feature of pig-butchering schemes and is repeatedly

documented in academic research and law-enforcement analyses. ROYCOIN's platform performed precisely this role here.

### C.    The Off-Ramp Defendant — Money Laundering and Exchange Off-Ramp Account(s)

68.    The Binance Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route Mr. Tumu's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the Binance Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of Mr. Tumu's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $4,950 of Mr. Tumu's assets were transferred to accounts controlled by the Binance Off-Ramp Defendant. By knowingly receiving, holding, converting, and transferring these fraud proceeds, the Binance Off-Ramp Defendant directly facilitated the monetization and dissipation of Mr. Tumu's losses.

### D.    Owen Doe — The Trading Coach

69.    Owen Doe acted as a trading coach within the scheme, providing purported expert guidance on cryptocurrency investments and directing Mr. Tumu's trading decisions on the fraudulent platform operated by ROYCOIN.

70.    Doe reinforced the credibility of the scheme by presenting as a knowledgeable and experienced trader. Doe provided specific instructions regarding when and how much to invest, shared fabricated trading signals

and market analysis, and encouraged Mr. Tumu to increase deposits based on purported profits and market opportunities.

71.    By acting as an intermediary between Mr. Tumu and the fraudulent platform, Doe served an essential function within the Enterprise. Doe's role was to sustain Mr. Tumu's confidence in the legitimacy of the scheme and to escalate Mr. Tumu's financial commitment over time.

### E.    Eric Lim — The Recovery Scammer

72.    After Mr. Tumu discovered the fraud and began seeking assistance to recover the stolen assets, Eric Lim contacted Mr. Tumu and represented that it could recover the lost funds. Eric Lim posed as a legitimate recovery service and made material misrepresentations regarding its ability, credentials, and methods for recovering cryptocurrency.

73.    Eric Lim induced Mr. Tumu to pay fees, taxes, or other charges purportedly required to facilitate the recovery process. These payments were fraudulent, and no genuine recovery efforts were undertaken.

### F.    Chapel Construction Inc — Wire Transfer Recipient

74.    Chapel Construction Inc maintained a bank account that was used to receive wire transfers of funds from Mr. Tumu as part of the fraudulent scheme. Mr. Tumu was directed by the perpetrators to wire funds directly to Chapel Construction Inc's bank account, bypassing cryptocurrency channels.

75.   Chapel Construction Inc received these funds with knowledge, or with willful blindness to the fact, that the transfers were induced by fraud and constituted proceeds of unlawful activity.

## F.   Coordinated and Interdependent Conduct

76.   The Defendants' conduct was coordinated and interdependent. Each Defendant performed a specialized function that complemented the others and advanced the common objective of defrauding Mr. Tumu.

77.   Stephanie Doe induced the transfers through social engineering and emotional manipulation, Owen Doe reinforced the scheme's credibility by providing trading guidance and escalating investment commitments, ROYCOIN sustained the illusion of legitimate trading through a fraudulent platform, the Off-Ramp Defendant converted and off-ramped the stolen cryptocurrency, Eric Lim perpetuated secondary victimization by posing as a recovery service, and Chapel Construction Inc received wire transfers of victim funds into accounts under its control. Each Defendant played a distinct but complementary role in the fraudulent scheme, and their coordinated conduct caused the injuries alleged herein.

78.   These actions reflect a deliberate division of labor consistent with organized pig-butchering schemes and demonstrate knowing participation in a common plan that directly caused Mr. Tumu's losses. Defendants did not merely receive cryptocurrency incidentally or passively. Each Defendant knowingly agreed to perform a specific function within the scheme and undertook affirmative acts in furtherance of that role. These acts

included placing accounts or wallet infrastructure at the disposal of the scheme, exercising discretion over the receipt and movement of funds, and repeatedly performing the same functions as part of an ongoing operation.

## VIII.  Evidence of Multiple Victims and Ongoing Fraudulent Activity

79.    The fraudulent conduct described above was not limited to Mr. Tumu or to a single, isolated incident. Blockchain tracing and analysis of transactions associated with Defendants' wallet addresses and exchange accounts reveal that Defendants received cryptocurrency from numerous additional sources consistent with victim transfers in similar fraud schemes.

80.    Backward tracing of transactions flowing into wallet addresses and exchange accounts controlled by the Defendants shows repeated deposits originating from multiple U.S.-based cryptocurrency exchanges and other sources associated with individual retail accounts, rather than a single origin or legitimate business activity.

81.    These incoming transactions occurred over an extended period exceeding one year, with substantial amounts transferred at regular intervals. The volume, timing, and structure of these transactions are inconsistent with ordinary investment activity and are consistent with the aggregation of proceeds from multiple fraud victims.

82.    The traced transactions include deposits traceable to accounts at U.S.-based exchanges commonly used by individual consumers, indicating

that the scheme affected multiple victims located in the United States, not solely Mr. Tumu in this action.

83. The repeated receipt of funds from different sources, across different exchanges, and over a prolonged period demonstrates that Defendants' conduct was part of a continuing course of fraudulent activity, rather than a single completed act. The same wallet addresses, exchange accounts, and laundering pathways were reused to process victim funds.

84. Moreover, tracing shows that Defendants' infrastructure remained active after Mr. Tumu's losses were incurred, and continued to receive and move cryptocurrency in a manner consistent with ongoing fraudulent activity. This pattern indicates a threat of continued criminal conduct absent judicial intervention.

85. The existence of multiple victims, repeated transactions, and the reuse of the same laundering and pooling mechanisms confirms that Defendants' scheme was designed to operate indefinitely and to extract cryptocurrency from additional victims over time.

## IX.    Causes of Action

86. Plaintiff brings the following causes of action against the Defendants. The allegations set out above are incorporated into each of the causes of action that follow as if fully restated therein.

## COUNT ONE
### RACKETEERING IN VIOLATION OF 18 U.S.C. § 1964(C)
### AGAINST ALL DEFENDANTS

87.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### A.     The RICO Enterprise

88.     At all relevant times, Defendants Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc were associated with an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

89.     The Enterprise consisted of a group of individuals and entities associated in fact for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims, laundering the proceeds, and consolidating and enjoying the fraud proceeds.

90.     The Enterprise had relationships, longevity, and structure sufficient to permit its members to pursue the Enterprise's purpose. Defendants performed distinct but complementary roles pursuant to an agreed-upon division of labor, including grooming victims, operating a fraudulent trading platform, laundering proceeds through exchange off-ramps, and consolidating assets in pooling addresses.

**B.    Interstate Commerce**

91.    At all relevant times, the activities of the Enterprise affected interstate and foreign commerce, including through the use of interstate wire communications, internet-based messaging platforms, cryptocurrency networks, and centralized cryptocurrency exchanges operating in or affecting the United States.

**C.    Conduct or Participation in the Enterprise's Affairs**

92.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

93.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

94.    Stephanie Doe conducted the Enterprise's affairs by initiating and maintaining communications with Mr. Tumu, making fraudulent misrepresentations, cultivating trust through fabricated identities, and inducing Mr. Tumu to transfer cryptocurrency pursuant to the Enterprise's scheme.

95.    ROYCOIN conducted the Enterprise's affairs by operating and controlling the fraudulent trading platform that simulated investment activity, displayed fabricated profits, and reinforced the misrepresentations used to induce additional cryptocurrency transfers. ROYCOIN knowingly

provided the technical infrastructure necessary to sustain the illusion of legitimate investment activity.

96. The Off-Ramp Defendant conducted the Enterprise's affairs by knowingly and affirmatively agreeing to serve as a laundering and off-ramp conduit for fraud proceeds. The Off-Ramp Defendant agreed with other members of the Enterprise to receive stolen cryptocurrency into centralized exchange accounts and to convert, withdraw, and transfer those assets in furtherance of the scheme.

97. The Off-Ramp Defendant roles were not passive or incidental. By agreeing to place exchange accounts at the disposal of the Enterprise, knowingly receiving large volumes of fraud proceeds, and executing conversions and withdrawals consistent with laundering activity, the Off-Ramp Defendant exercised discretion, judgment, and control that furthered the Enterprise's objectives and enabled the laundering and monetization of stolen assets.

### D. Pattern of Racketeering Activity

98. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

99. These predicate acts included, without limitation, the transmission of fraudulent representations via interstate wire communications, the use of interstate wires to direct victims to transfer cryptocurrency, the operation of a fraudulent trading platform through

internet-based systems, and the use of interstate wires to move, convert, launder, and consolidate fraud proceeds.

100.    The racketeering acts were related, as they shared common purposes, victims, methods, and participants, and they amounted to or posed a threat of continued criminal activity.

101.    The racketeering acts constituted closed-ended continuity, as they occurred over a substantial period of time, and open-ended continuity, as the scheme was inherently capable of repetition and posed a continuing threat to additional victims.

### E.    Proximate Cause and Damages

102.    Defendants' violations of 18 U.S.C. § 1962(c) were the direct and proximate cause of Plaintiff's injuries, including the loss of cryptocurrency assets transferred in reliance on Defendants' fraudulent conduct.

103.    As a result of Defendants' RICO violations, Plaintiff suffered concrete financial losses, including but not limited to the value of misappropriated cryptocurrency, lost investment capital, and related damages.

### F.    Vicarious and Joint Liability

104.    Each Defendant is jointly and severally liable for the acts of the other Defendants committed in furtherance of the Enterprise's affairs.

105.    Defendants are also liable under principles of vicarious liability, aiding and abetting, and respondeat superior, as applicable.

### G.     Statute of Limitations Tolling

106.   Defendants concealed the existence of the Enterprise and the fraudulent nature of their conduct through fabricated platforms, false identities, and deliberate obfuscation of asset flows, thereby tolling the statute of limitations under principles of fraudulent concealment.

### H.     Relief

107.   Plaintiff seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, attorneys' fees, and appropriate equitable relief.

## COUNT TWO
### RACKETEERING CONSPIRACY - 18 U.S.C. § 1964(D)
### AGAINST ALL DEFENDANTS

108.   Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

109.   Defendants Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc knowingly agreed and conspired to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

110.   Each Defendant knowingly agreed that a member of the conspiracy would commit at least two acts of racketeering activity constituting wire fraud, money laundering, or related offenses, and each

Defendant agreed to perform a specific role in furtherance of the Enterprise's unlawful objectives.

111. The conspiracy was formed for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims through fraudulent means, laundering and off-ramping the proceeds, and consolidating and enjoying the fraud proceeds.

112. In furtherance of the conspiracy, Stephanie Doe agreed to initiate and maintain deceptive communications with victims, to make material misrepresentations, and to induce victims to transfer cryptocurrency pursuant to the scheme.

113. In furtherance of the conspiracy, ROYCOIN agreed to operate and control a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated profits, and reinforce the misrepresentations used to induce additional transfers.

114. In furtherance of the conspiracy, the Off-Ramp Defendant agreed to provide exchange accounts under their control for the purpose of receiving, converting, withdrawing, and transferring the proceeds of fraud, with knowledge that such accounts would be used to launder cryptocurrency derived from victim losses.

115. Each Defendant knew the essential nature of the plan and knowingly agreed to facilitate the scheme by performing acts that were

necessary or advantageous to the Enterprise's success, even if each Defendant did not personally commit every racketeering act.

116. The conspiracy contemplated and resulted in the commission of multiple overt acts, including the use of interstate wire communications, the operation of fraudulent online infrastructure, the transfer of cryptocurrency through blockchain networks, and the laundering and consolidation of fraud proceeds.

117. Plaintiff was injured in Plaintiff's business or property by reason of the Defendants' agreement to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, entitling Plaintiff to relief under 18 U.S.C. § 1964.

### COUNT THREE
### CONVERSION – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

118. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

119. At all relevant times, Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc knowingly participated in a common plan and scheme to defraud Mr. Tumu through a pig-butchering cryptocurrency investment scam.

120. In furtherance of the scheme, Stephanie Doe made material misrepresentations and omissions to Mr. Tumu, including false statements regarding Stephanie Doe's identity, experience, and intentions; the

legitimacy of the purported trading platform operated by ROYCOIN; the existence of real trading activity and profits; and Mr. Tumu's ability to withdraw funds.

121.    These misrepresentations were false when made and were known to be false by Stephanie Doe at the time they were made. They were communicated with the intent to induce Mr. Tumu to rely on them and to transfer cryptocurrency pursuant to the scheme.

122.    ROYCOIN knowingly participated in and furthered the fraud by operating and controlling a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated account balances and profits, and reinforce the misrepresentations communicated to Mr. Tumu. ROYCOIN knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

123.    The Off-Ramp Defendant knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. They knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

124.    Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud.

Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

125. The Victim reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

126. As a direct and proximate result of Defendants' fraudulent conduct, Mr. Tumu suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FOUR
### FRAUD – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

127. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

128. At all relevant times, Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc knowingly participated in a common plan and scheme to defraud Mr. Tumu through a pig-butchering cryptocurrency investment scam.

129. In furtherance of the scheme, Stephanie Doe made material misrepresentations and omissions to Mr. Tumu, including false statements regarding Stephanie Doe's identity, experience, and intentions; the legitimacy of the purported trading platform operated by ROYCOIN; the

existence of real trading activity and profits; and Mr. Tumu's ability to withdraw funds.

130.    These misrepresentations were false when made and were known to be false by Stephanie Doe at the time they were made. They were communicated with the intent to induce Mr. Tumu to rely on them and to transfer cryptocurrency pursuant to the scheme.

131.    ROYCOIN knowingly participated in and furthered the fraud by operating and controlling a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated account balances and profits, and reinforce the misrepresentations communicated to Mr. Tumu. ROYCOIN knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

132.    The Off-Ramp Defendant knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. The Off-Ramp Defendant knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

133.    Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

134. The Victim reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

135. As a direct and proximate result of Defendants' fraudulent conduct, Mr. Tumu suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FIVE
### UNJUST ENRICHMENT/RESTITUTION – TEXAS COMMON LAW AGAINST ALL DEFENDANTS

136. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

137. Defendants Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc each received benefits at the expense of Mr. Tumu, including cryptocurrency assets and proceeds thereof that were misappropriated through fraud and deception.

138. Defendants knowingly accepted, retained, used, or controlled these benefits, either directly or indirectly, as part of the coordinated scheme described herein.

139. Defendants' receipt and retention of Mr. Tumu's cryptocurrency was unjust and inequitable because the assets were obtained through wrongful conduct, without lawful consideration, and in violation of Mr. Tumu's rights.

140.   Equity and good conscience require restitution of all benefits unjustly obtained by Defendants, including the return of misappropriated cryptocurrency and any proceeds derived therefrom.

141.   Defendants hold such assets in constructive trust for the benefit of Mr. Tumu and must disgorge all unjust enrichment obtained as a result of their conduct.

## COUNT SIX
### CIVIL CONSPIRACY - TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

142.   Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

143.   Defendants Stephanie Doe, Owen Doe, ROYCOIN, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc knowingly agreed and conspired with one another to commit unlawful acts, including fraud, conversion, and related wrongful conduct, or to commit lawful acts by unlawful means.

144.   Each Defendant knew of the essential nature and scope of the conspiratorial plan and agreed, expressly or tacitly, to participate in and further the scheme by performing a specific role within a coordinated division of labor.

145.   In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to:

a. Making material misrepresentations to induce cryptocurrency transfers;

b. Operating fraudulent investment infrastructure;

c. Receiving, laundering, off-ramping, pooling, and retaining fraud proceeds;

d. Concealing the source and movement of misappropriated assets.

146. Defendants' acts were interdependent and mutually reinforcing, and each Defendant benefitted from the conspiracy by receiving or controlling proceeds derived from the unlawful conduct.

147. As a direct and proximate result of Defendants' conspiratorial conduct, Mr. Tumu suffered substantial damages, including the loss of cryptocurrency assets.

148. Each Defendant is jointly and severally liable for all damages caused by the acts of any co-conspirator committed in furtherance of the conspiracy.

## COUNT SEVEN
### MONEY HAD & RECEIVED – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

149. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

150.   The Off-Ramp Defendant received money and/or cryptocurrency assets that belonged to Mr. Tumu and were wrongfully obtained through fraud and conversion.

151.   The assets received by the Off-Ramp Defendant were traceable to Mr. Tumu's transfers and were accepted with knowledge, or willful blindness, that the assets constituted proceeds of unlawful activity.

152.   The Off-Ramp Defendant retained, controlled, or used these assets for their own benefit or for the benefit of the fraudulent scheme.

153.   In equity and good conscience, the Defendants should not be permitted to retain Mr. Tumu's property, and restitution is required.

154.   Plaintiff is entitled to recover from Defendants the full amount of money and cryptocurrency had and received, together with interest and other equitable relief.

## X.    Relief Sought

155.   Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and jointly and severally against ROYCOIN, Stephanie Doe, Owen Doe, the Binance Off-Ramp Defendant, Eric Lim, and Chapel Construction Inc and grant the following relief:

### A.    Injunctive and Equitable Relief

156.   A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, their agents, employees, co-conspirators, and all persons acting in concert with them from directly or indirectly:

a.  Engaging in pig-butchering schemes or similar fraudulent conduct;

b.  Soliciting or inducing cryptocurrency transfers through misrepresentation or deception;

c.  Transferring, dissipating, concealing, converting, or otherwise disposing of assets traceable to the scheme.

d.  An order freezing all cryptocurrency, fiat currency, accounts, wallets, exchange accounts, and other assets owned by, controlled by, or traceable to Defendants that are derived from or connected to the fraudulent scheme.

e.  An order authorizing expedited discovery, including but not limited to subpoenas directed to cryptocurrency exchanges, custodial service providers, financial institutions, and other third parties, for the purpose of identifying, tracing, and preserving assets and identifying additional participants in the scheme.

f.  An order requiring Defendants to provide a full accounting of all cryptocurrency, fiat currency, wallets, exchange accounts, and other assets received, transferred, converted, or controlled in connection with the scheme.

g.  An order imposing a constructive trust over all cryptocurrency, fiat currency, exchange accounts, wallets,

and other assets that are traceable to the fraudulent scheme, including assets held by Defendants or by third parties for Defendants' benefit.

h. An order directing any cryptocurrency exchange, custodial service, or financial institution holding assets subject to the constructive trust to preserve such assets and, upon further order of the Court, to transfer or release such assets to Mr. Tumu.

## B.    RICO Remedies (18 U.S.C. § 1964)

157.    Treble damages pursuant to 18 U.S.C. § 1964(c) for injuries sustained by Plaintiff as a result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d).

158.    An order disgorging all ill-gotten gains obtained by Defendants as a result of the racketeering activity.

159.    An order imposing a constructive trust over all assets traceable to the racketeering enterprise.

160.    An award of costs, expenses, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## C.    Compensatory and Restitutionary Relief

161.    Compensatory damages in an amount to be proven at trial for all losses suffered by Plaintiff, including but not limited to the value of misappropriated cryptocurrency and related financial harm.

162. Restitution of all cryptocurrency and other assets wrongfully taken from Plaintiff.

163. Pre-judgment and post-judgment interest as permitted by law.

### D. Declaratory Relief

164. A declaration that Defendants' conduct violated federal RICO statutes and common law governing fraud and conversion.

165. A declaration that Plaintiff is entitled to recover assets traceable to the fraudulent scheme from Defendants and any third parties holding such assets for Defendants' benefit.

166. A declaration that Defendants possess no lawful ownership interest in assets traceable to the scheme and that such assets are held in equity for Mr. Tumu.

### E. Additional Relief

167. An order appointing a receiver or special master, if necessary, to identify, marshal, manage, and preserve assets subject to this action.

168. Such other and further relief as the Court deems just and proper.

### XI. Jury Demand

169. Plaintiff demands a trial by jury on all claims so triable.

Dated:  June 16, 2026

Respectfully submitted,

THE HODA LAW FIRM

Alexander J. Crous, Esq.
Tx. Bar No. 24136488
3120 Southwest Fwy
Ste. 101 PMB 51811
Houston, TX 77098
o. (832) 838-0036
alex@thehodalawfirm.com